## HUDSON TRUST AND SAVINGS INSTITUTION

*v.*

## CARR-CURRAN PAPER MILLS COMPANY, THE CITY OF HOBOKEN et al.

[Submitted April 29th, 1899. Decided May 11th, 1899. Filed September 26th, 1899.]

1. The charter of 1855 gave to the city of Hoboken power to provide for water-supply, to impose assessments for the use thereof and to make such assessments liens on the land so assessed paramount to all other encumbrances, and provided for the sale of the real estate for such assessments and its redemption by the owners.—*Held*, that the priority of the city's lien for water rents over prior mortgages was dependent on assessments against the property using the water, of a certain amount each year, and could not be urged in favor of a lien for water sold by measure, the rate varying with the amount of water used.

2. The mortgagee of a paper mill, whose lien was inferior to that of the city of Hoboken for water rents under its charter of 1855, gave notice to the city, when the mortgagor was in arrears for one quarter, to turn the water off. The city did so, but in such a manner that the employes of the mill immediately turned it on again; and thereafter the city read its meter and charged it for water for several succeeding quarters, which charges remained unpaid.—*Held*, that the city could not then claim priority for its lien.

3. The General Waterworks law of 1876, providing for the supply of water in cities, the fixing and collecting of water rents, and prices for water, and a lien upon the real estate for such water rents, and for the shutting off of such

water when such rents are due and unpaid, and the sale of the property at public auction, if not paid, without provision for redemption from such sale, does not give such a lien upon the property as will take priority over mortgages previously given.

4. Portions of machinery assembled together and set up in a special building erected for its reception, which may be removed without trouble and used in any similar mill, may be treated either as a chattel or a fixture, according as the intention of the parties and the justice of the case may require.

5. The actual delivery of possession of property sold, without receiving the contract price due upon delivery, does not in all cases destroy the right of the vendor to resume possession for failure to make such payment unless he waives his right thereto.

6. The delivery of machinery upon the premises of the vendee and putting it in place, in order to show its capacity to do its work, is not a waiver of the right of the vendor to resume possession upon failure to pay the part of the purchase price due upon delivery, according to contract.

7. The owner of a mill subject to a mortgage, and mill machinery subject to a chattel mortgage, contracted for certain alterations and additions to such machinery, payment to be made half cash on delivery and the remainder in notes at three months.  The changes were made but only part of the contract price paid, although repeated efforts were made to collect the balance.  The vendor finally accepted a chattel mortgage for the remainder of the debt.— *Held,* that the lien of the mortgage for the purchase price was paramount to that of the original mortgages, except as to so much of the original machine as constituted a part of the perfected machine.

The object of the bill is to foreclose two certain mortgages dated April 12th, 1894, both given to secure the same bond, which is conditioned to pay the sum of $15,000 in one year, with interest.   One mortgage covers real estate, to wit, a paper-mill plant in the city of Hoboken, and the other personal chattels consisting of machinery, &c., situate therein.

Two questions (among others) arise upon the pleadings and the case made.

*First.* The city of Hoboken claims a lien upon the premises' paramount to complainant's mortgages to the extent of $7,292.37, besides interest, for water furnished by measurement to the Carr-Curran Paper Mills Company for use in making paper, between the 1st day of February, 1896, and the 1st day of May, 1898, nine quarters in all, or rather, eight quarters, for the bill for the quarter ending May 1st, 1898, was only $1.35.

*Second.* A question arises between the complainant and the defendants Clark & Spencer, as to the priority of complainant's mortgages over a chattel mortgage given by the Carr-Curran Paper Mills Company to Clark & Spencer on the 1st of December, 1897, to secure the payment of $3,500, and covering certain paper machinery in the mill.

*Mr. J. W. Rufus Besson* and *Mr. Augustus A. Rich,* for the complainant.

*Mr. James F. Minturn,* for the city of Hoboken.

*Mr. Henry M. Nutzhorn,* for Clark & Spencer.

*Mr. William D. Edwards* and *Mr. Maximilian T. Rosenberg,* for other defendants.

Pitney, V. C.

I will first consider the right of the city of Hoboken to a lien for water furnished.

The inhabitants of the city of Hoboken were created a city under the act of March 28th, 1855. *P. L. of 1855 p. 448.* Among the numeration of powers of the common council contained in the fortieth section of the act we find in the fifth paragraph, power

" to make all necessary arrangements for a full and copious supply of good and wholesome water for public and private use; to make ordinances for the distribution of the same, and to impose *assessments* for the use thereof, which *assessments* shall be binding upon improved and unimproved lots so *assessed,* and may be collected in the same manner as prescribed in this act for the collection of assessments for grading, paving, curbing, flagging and laying out of public streets," &c.

By a proviso the amount the common council might pay to any party furnishing water to the city by contract was limited to $20,000 a year.

By section 48 (*p. 471*) of the same act it is provided as follows:

Hudson Sav. Inst. *v.* Carr-Curran Paper Mills Co.

"That all taxes and assessments which shall hereafter be assessed or made upon any lands, tenements or real estate situate in said city, shall be and remain a lien thereon until paid, notwithstanding any devise, descent, alienation, mortgage or other encumbrance thereof; and that if the full amount of any such tax or assessment shall not be paid and satisfied within the time limited for the payment thereof, it shall and may be lawful for the council to cause such lands, tenements or real estate to be sold at public auction for the shortest terms for which any person will agree to take the same, and pay such tax or assessment, or the balance thereof remaining unpaid, with the interest thereon, and all costs, charges and expenses, and to execute, under the common seal of the said city, a declaration of such sale, to be signed by the mayor and city clerk, and to deliver the same to the purchaser; and such purchaser, his executors, administrators or assigns, shall, by virtue thereof, lawfully hold and enjoy the said lands, tenements or real estate, for his and their own proper use, against the owner or owners thereof, and all persons claiming under him or them, until his said term shall be completed and ended;"

And (*p. 472*)—

"that the lands, tenements or real estate, so sold, may be redeemed by the owner, mortgagee, occupant or person interested therein, or by any other person, for and on behalf of the owner, mortgagee or claimant of such lands, tenements or real estate, at any time within two years after the sale, for either taxes or assessments, or for both, by paying," &c.; * * * "no mortgagee, whose mortgage shall have been duly recorded before sale for any tax or assessment, shall be affected by such sale, unless six months' notice in writing shall have been given to him by the purchaser, or those claiming under him, either personally, or if not to be found in the city, then such notice shall be deposited in the post-office of said city, directed to him at his last-known place of residence (or at the post-office nearest thereto), but nothing herein contained shall be so construed so as to impair the lien created by such tax, assessment or sale."

And by section 52 (*p. 475*) provision is made for assessing the expense for improvements in opening, grading, curbing, bridging and paving streets, and for flagging sidewalks, &c., by assessment upon the lands and real estate benefited.

The effect of clauses similar to these, found in the charter of Jersey City, was passed upon by the court of errors and appeals in the case of *Vreeland* v. *Jersey City, 10 Stew. Eq. 574,* and it was held that the city had a priority over a mortgage for its ordinary water rates or rents assessed after the mortgage was given. That decision of the court of appeals was tested in the

supreme court of the United States by a case made up and carried through our courts without being reported, our courts adopting the opinion to which I have just referred, and the supreme court of the United States affirmed the ruling just stated. *Provident Institution for Savings* v. *Jersey City, 113 U. S. 506.*

If, then, the charges for water in this case were of precisely the same character as those dealt with in *Vreeland* v. *Jersey City,* and the lien was claimed under the original charter of Hoboken, and there were no other element in the case, it would seem that the lien of the city would be paramount to the complainant's mortgages.

But the complainant contends that the present case is distinguishable in two respects at least. The authority in the charter of Hoboken, as we have seen, is

"to impose *assessments* for the use thereof [water], which *assessments* shall be binding upon improved and unimproved lots so *assessed,* and may be collected in the same manner as prescribed, &c., for the collection of *assessments* of grading, paving, &c., and laying out of public streets," &c.

That provision, it is argued, contemplated the assessment of a certain amount of money each year on a lot, whether improved or not, which assessment was not to be varied according to the amount of water used. There is a further provision in the act of 1855 that the water rate should not exceed the rate charged in New York or Jersey City, and the argument is that the whole scheme was inconsistent with the laying of rates varying with the quantity of water consumed. The argument, in short, is that a sale of water by measure has none of the characteristics or qualities of an assessment.

There is no proof in the case as to whether or not the practice of selling water by measure in large quantities to factories, was then in vogue and known to the legislature or the city.

It is further argued that a mortgagee taking a mortgage under the legislature of 1855 might ascertain with reasonable certainty in advance what the amount of the water rates or rents would be, and could provide against them ; and that it was not in the

contemplation of the legislature that water should be furnished under a contract at so much per thousand cubic feet and amounting in price to nearly $1,000 a quarter, which, if not paid, should become a lien upon the lands superior to a prior mortgage. That such was the idea in the minds of the legislature and of the city is further manifested—so it is argued—by the tariff of rates adopted by the city of Hoboken and revised from time to time, in which there is a regular scale and schedule of charges by the year, varying with the size of the lot and building, and number of stories; and there are other annual charges for special uses—greenhouses, hotels, boarding-houses, markets, milk stores, photograph galleries, steam engines, boilers, &c., none of them based upon the actual quantity of water consumed.

If the question depended upon the charter of 1855, I should, under pressure of these considerations, be inclined to the opinion that a lien for water furnished to the amount and in the manner that appears in this case, was not intended by the legislature to be paramount to mortgages previously imposed.

But the complainant makes a further point, which is that on the 13th of May, 1896, and as soon as it found that the charges for water furnished during the quarter ending at that time were due, and when only $659.95 were in arrear, it served upon the city a notice in writing calling its attention to the arrears of water rent, and requesting the city to cut off the further supply from the mortgaged premises; and that in case of the city's failure so to do the complainant would deny the priority of its claim for any further water which might be thereafter supplied, and gave the city notice of the mortgages held by complainant. In pursuance of that notice the city turned off the water from the paper mill, but did it in such a manner, and left the apparatus in such a condition, that the paper mill employes immediately turned it on again. This, it seems to me, was tantamount to not turning it off at all. For it was a mere idle ceremony for the city to turn the water off unless it did it in such a manner that it could not be turned on again without the consent of the city authorities. And there is no pretence that the city gave any notice to the complainant that the water was so turned on, but

by its agent it duly read the meter of the paper mill company, and on August 1st following, duly charged the company again for water consumed during the previous quarter, and so on until the company stopped business in the month of March, 1898.

Now it seems to me that under these circumstances it would be inequitable and unjust for the city to claim this great priority, which will so seriously affect the complainant's rights.

But, in the second place, the complainant contends that the city is not now entitled to the benefit of the clause in question, found in its original charter, for the following reasons: Under a supplement to its original charter, passed in 1857 (*P. L. of 1857 p. 500*), it had been supplied with Passaic water from Jersey City, and in the year 1880 wishing to change its source of supply desired to enter into a contract with the Hackensack Water Company to furnish it with water, which would amount to an expenditure of much more than $20,000 a year, and that the latter company, not being satisfied that the city had the power to enter into such a contract, insisted that it should formally and legally accept the benefits of the provisions of the general act of 1876 (*P. L. of 1876 p. 366*); whereupon the city did, by a vote of its inhabitants, formally accept the provisions of the act of 1876, and has ever since proceeded under it, as appears by the case of *Hackensack Water Co.* v. *Hoboken, 22 Vr. 220.*

Now the act of 1876 is a complete act in itself, and contains provisions for the collection of *water rents* and *prices for water*. It seems for the first to contemplate the selling of water by measure. By the ninth section of that act the municipal authorities are authorized to pass all such ordinances, resolutions and regulations as may be necessary for fixing and collecting the *water rents or prices* for water. This language—"water rents or prices"—is in marked contrast with the word "*assessment*," used in the original charters of Jersey City and Hoboken. The tenth section provides that "such price or rent so fixed shall be a lien upon said house, tenement, building or lot, until the same shall be paid and satisfied;" that the municipality shall have authority to require payment in advance for *the use or rent of water* fur-

nished by said city in or upon any building, place or premises, and in case prompt payment of any water rent or rents shall not be made when the same become due, *the water shall be shut off from such building,* place or premises until such arrears with interest thereon shall be *fully paid ; and, if the same are not paid* after notice, such houses, tenements and lots will be sold at public auction, at a day and place to be specified therein, for the lowest term at which any person will offer to take the same, in consideration of paying the amount of the water rent, with interest thereon due on the same and the expenses of the sale, and, if not paid, then the municipality may cause

"such houses, tenements or lots to be sold at public auction for a term for the purposes and in the manner expressed in said advertisement, and to give a declaration of such sale to the purchaser thereof, under the common seal of the said city, and such purchaser, his executors, administrators or assigns, shall, by virtue thereof and of this act, lawfully hold and enjoy the same for his and their own proper use, against the owner or owners thereof, claiming under him or them, until his term shall be complete and ended ; "

And

"in addition to the remedies above provided, all water rents due, or to become due to the said city, may be collected and recovered in the name of the treasurer of said city in an action of debt," &c.

No provision is made for the redemption of the premises from such sale, either by the owner or any mortgagee or other person interested therein.

This provision for the enforcement of the lien is in marked contrast with that found in the charters of Hoboken and Jersey City, and also with that found in *Paterson* v. *O'Neill, 5 Stew. Eq. 386,* where Judge Dodd, speaking for the court of errors and appeals, distinguished the language in that case from the language of the act under consideration in *Hopper* v. *Malleson, 1 C. E. Gr. 382.* In *Paterson* v. *O'Neill* the tax was a general one, and the statute required that land should be assessed at its full value without any deduction for mortgages, and that mortgages should not be taxed in the hands of persons holding them, and that in case of a sale the mortgagee or tenant, or any person,

might redeem the premises within twelve months from the time of sale.

In the case of *Hopper* v. *Malleson* the act provided that any assessment of taxes made in said county against any person, on account of any real estate of such person or body corporate, shall be and remain a lien on all the lands, tenements, hereditaments or real estate, on account of which said assessment shall be made, with lawful interest, and costs and fees in relation to the assessment and collection thereof, for the space of five years from the time when the taxes became payable; and that the land shall be sold and conveyed to such person as will agree to take the same for the shortest term, and pay the tax, interes*, costs, fees and expenses, and that the grantee, by virtue of such sale and conveyance, shall hold and enjoy the said real estate during the term for which he shall have purchased the same, for his own use and benefit, against the owner or owners thereof, and all and every person or persons claiming under her, him or them, until the said term shall be fully completed and ended.

This language is quite similar to that used in the General Waterworks law of 1876 now under consideration.

In *Morrow* v. *Dows, 1 Stew. Eq. 459,* the General Tax law was under consideration, and in discussing the question Mr. Justice Van Syckel (at *p. 464*) says : " The mere declaration by the lawmaker that taxes shall be a lien upon the land assessed does not of itself manifest a purpose to affect every estate which may be held in such lands, because lands are divisible into many estates, either of which may be sold without impairing the other. The legislative will to that end must be clearly manifested to give such a law any operation beyond the estate of him upon whom the assessment is cast."

Here there is simply a debt of the paper company, without any of the characteristics of an assessment properly levied upon the land.

The extent of the lien to be acquired must, of course, depend wholly upon the verbiage of the statute ; and I am of the opinion that the only statute to which the city can now appeal to define

its lien is that found in the enactment of 1876, and that I think falls short of giving such a lien as will reach beyond the estate of the person who contracts the debt. That the legislature did not contemplate the accumulation of unpaid water rents is manifest from the mandatory character of the provision for the shutting off of the water. After providing that the water rent should be a lien upon the lands it gives power to require payment in advance, and declares

"and in case prompt payment of any water rent or rents shall not be made when the same become due, the water *shall be shut off* from such building, place or premises until such arrears, with interest thereon, shall be fully paid."

Now, the fact that the legislature did not contemplate any great accumulation of water rents may be the reason why it did not deem it necessary to provide for a lien which shall take precedence over mortgages and compel their holders to keep strict watch of the accumulation of water rents.

I have said that I think the city is confined to the remedies provided in the general act of 1876. The reason for that opinion is that the legislature, by the original charter of Hoboken, confined the stringent remedy of a lien which should underlie previous mortgages to assessments such as I have mentioned, and to the extent only of $20,000; and when the city, in order to escape the stringency of this limitation, accepted the provisions of the act of 1876, it must be held to have waived the benefit of the provisions of its original charter in that respect. In short, the legislature has never given the city power to make debts incurred by the owner of the equity of redemption for water sold by meter and in varying quantities a lien on land paramount to a previous mortgage, where the total amount of water rents, as here, is in excess of $20,000.

The next question arises between the complainant and the defendants Clark & Spencer as to the priority of its mortgages over a chattel mortgage given by the Carr-Curran Paper Mills Company to Clark & Spencer on the 1st of December, 1897, to secure the payment of $3,500, covering certain paper machinery in the mill. The facts involved are as follows:

Clark & Spencer are manufacturers of paper machinery at Lee, Massachusetts. In the early part of the year 1897 the paper mills company purchased a second-hand paper machine, and employed Clark & Spencer to install it in their works at Hoboken. For the work of setting up the old machine in the mill Clark & Spencer have been paid. When this machine was put in place it was found to be so defective, both in size and character, as to require large additions and alterations in the way of substitution of parts, before it satisfied the paper company's wants; and on the 20th of May, 1897, a contract in writing was entered into between the paper company and Clark & Spencer for the addition to the machine in question of seven dryers, 36″ x 56½″, which are heavy, hollow cylinders that are filled with steam, and revolve in such a way as to dry the pulp and turn it into paper; also the frames, boxes, gears and stands in which they stand and in which they revolve, iron felt-rolls, springs, &c., all complete, for the sum of $1,215, besides freight from Lee, Massachusetts, to be set up and made ready for operation on the grounds of the company at Hoboken, the language in this respect being, "$607.50 cash; balance three months' note; when machinery has been set up at mill and same is in perfect running order, then cash payment to be made."

Subsequent to that, and about the 1st of June, a further contract was made for other additions to the machine and substitution of some of the parts of the old machine, together with shafting and gearing. This contract was for $1,725. No terms of payment are mentioned in it. Later still orders were given for new machinery, until the total was something over $4,000.

The machinery was all delivered, in pieces, of course, which were assembled and the machine put in running order on the 1st of October, 1897. But the payment of half cash for that delivered under the contract of May 20th was not made, nor was any payment made under the contract of June 1st. Clark & Spencer demanded payment and tried to get it, but were unable except to the extent of between $700 and $800, which left their debt $3,500. There never was any waiver of the right to immediate payment upon the part of Clark & Spencer, but on

the 1st of December, 1897, they accepted a chattel mortgage from the paper company for $3,500, which was duly recorded on December 11th. The question is whether this chattel mortgage shall, under the circumstances, have precedence over the mortgages of the complainant.

The complainant's claim under each of its mortgages is in the alternate. Its counsel argued that if this paper machine is to be considered a chattel, then it takes it under the clause covering after-acquired chattels found in its chattel mortgage; if it became a fixture and thereby converted into realty, then it is claimed under its real estate mortgage, and it urges the latter as the more reliable ground.

It seems to me that it matters little whether the complainant's claim rests upon its real estate or its chattel mortgage. In either case the fundamental question is, did the chattel ever become the property of the paper mill company as against Clark & Spencer? In either case complainant is met by a strong indisposition manifested at all times by the courts of this as well as of other states, to so construe the law as to permit one man's property to be taken to pay another man's debt. The leading authorities in this state are *Campbell* v. *Roddy, 17 Stew. Eq. 244; Leatherbury* v. *Connor, 25 Vr. 172; Palmateer* v. *Robinson, 31 Vr. 433,* and *General Electric Co.* v. *Transit Equipment Co., 12 Dick. Ch. Rep. 460,* in dealing with the case of Crocker-Wheeler Co., one of the defendants in that suit.

The machinery in this case is of such a character that it may be treated either as a chattel or as a fixture, according as the intention of the parties and the justice of the case may require. A special building was erected for its reception. The evidence shows that it was a one-story affair, built upon piles, as an addition to or extension of the main factory. It appears that all the machinery was constructed in sections and put in its place, one end in that addition being left open for its reception; but it further appears that if taken apart, as it must be in order to be removed, it can be taken out of the building by the existing openings through the main building by the removal of manufactured paper and other articles to make room for its passage, and

that an opening in the side of the new addition can be made at trifling expense to allow of its removal directly without going through the main building. There is nothing special in its character; it was not specially adapted to that particular paper mill; it is of a standard make, fit for use in any paper mill. The plan of building it in sections, fastened to each other by bolts, was the usual one necessarily adopted in all such structures in order to enable it to be moved. So that if, after it was erected and put in place, Clark & Spencer, by the terms of their contract, retained the right to resume possession and carry it away, it was practicable for them to do so without injuring either the machine or the real estate. And the question is whether they did retain that right.

An examination of the authorities discloses the law to be that the question as to whether or not title to a chattel passes under particular circumstances is to be considered in more than one aspect—so that there are cases in which it may be said to pass or not at the vendor's option—and the vendor may have the right to retain or to resume possession after delivery, while the risk of the title, so far as fire and casual destruction goes, is that of the vendee. And further, the authorities are clear that the actual delivery of possession without receiving the contract price due upon delivery does not in all cases destroy the right of the vendor to resume possession for failure of such payment. His right to resume the possession is not lost by a bare delivery, unless he waives his right to the payment which is due upon delivery.

In this case the mere delivery upon the premises of the vendee of the chattel and installing it, in order to show its capacity to do its work, was not a waiver by the vendors of their right to resume possession if the purchase price was not paid according to contract, because it was part of the contract that the chattel should not only be delivered on the premises of the vendee but should be shown to be capable and fit to do the work required of it.

This, I think, is the result of the great weight of authority when carefully examined. I have found the authorities well

collected by Mr. Corbin in his additions to *Benjamin on Sales* §§ *318, 324 et seq.*, and the law is summed up by Mr. Justice Depue in *Cole* v. *Berry, 13 Vr. 308* (at *p. 310*), thus: " Payment of the contract price is one of the most usual conditions on which the transfer of title depends. It is generally a condition to be performed simultaneously with delivery. If such be the contract a waiver of the condition may be presumed from an unconditional delivery without exacting payment, and in the absence of explanatory proof the property will vest in the purchaser."

The present case gives the explanatory proof thus required. It was impossible for Clark & Spencer to deliver the machine except in sections, and it was impossible for them to fulfill their contract except by putting it together on the premises of the vendee. It was practically impossible to make a delivery and payment simultaneously. The case is in marked contrast with that of a tradesman selling an article of merchandise across a counter and holding on to it with one hand while receiving the pay with the other. The delivery in the case must necessarily precede to a slight degree the payment. *Leatherbury* v. *Connor* illustrates this view. There the manufacturers, as here, sold to a corporation a machine—steam engine and boiler—upon terms of receiving upon delivery a note for the price, secured by a chattel mortgage upon the machine. The delivery was duly made, but the mortgage was not executed or delivered. The chancellor, speaking for the court of errors and appeals, says of this transaction, " the delivery did not make the sale absolute," and held that the seller had, nevertheless, the right to resume possession, and but for the intervention of the rights of third parties, innocent purchasers for value, of which there are none here, the title of the vendors would have prevailed. The case was disposed of solely upon the failure of the vendors to account at the trial below for their resting quietly for more than a month while the rights of other parties intervened.

In the case in hand, as to the first installments, the contract was half cash and half in a note at three months. As to the last installments, the written contract was silent as to the terms

of payment. The presumption would be that it should be cash on delivery, but the parties admitted that the terms were the same—one-half cash and one-half in a note at three months. The proof shows, and it was admitted by counsel, that persistent efforts were made by Clark & Spencer to obtain their pay, and that they finally accepted the chattel mortgage in question.

Under these circumstances it seems to me that the law of the land does not declare that their property shall be taken to advance the interests of the prior mortgage-holder. The language of Mr. Justice Reed, in *Campbell* v. *Roddy, 17 Stew. Eq. 251,* is apt.

For these reasons I hold that the right in equity of Clark & Spencer is paramount to that of the complainant, except as to so much of the original machine as constituted a part of the perfected machine as left by Clark & Spencer. No proof was given as to what proportion of the value of the perfected machine is due to the original structure, and what proportion to the parts added by Clark & Spencer. Nor was any proof given as to what, if any, injury will be done to the building by the removal of the machine, if the side should be opened to permit it to be taken out in that way. The proof shows clearly enough, as I have said, that it may be taken out through the original building without any injury.

With regard to the proportionate interest of the complainant and Clark & Spencer in the machinery, I am of the opinion that if the parties cannot agree upon it, it will be convenient to ascertain it after the machinery has been sold and the proceeds are under the control of the court. An inquiry on that subject can be made pending the sale. I see no occasion to delay the sale until the matter is determined.

Other questions arise among other junior creditors, the decision of which counsel agree shall await the result of the sale under the complainant's mortgages.